[No. 13767. Department Two. August 11, 1917.]

## OTTO E. HUBENTHAL, *Appellant*, v. SPOKANE & INLAND EMPIRE RAILROAD COMPANY, *Respondent*.[1]

RAILROADS—CROSSING ACCIDENTS—NEGLIGENCE—EVIDENCE — SUFFICIENCY. It is negligence to run an electric train through a deep cut onto a much used crossing, where the view from the road was obstructed, at 50 miles per hour, without any warning except a faint whistle the instant before reaching the crossing.

SAME—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. The contributory negligence of the driver of an automobile, struck by an electric train at a crossing, is for the jury, where the crossing was in a deep cut, he approached the tracks at about one mile per hour, looking all the time for an approaching train, but owing to obstruction of the view, it was impossible for him to see the train, approaching at high speed, until the front end of the automobile was about six inches from the rail, when an attempt to reverse and back up would have been more hazardous than to attempt to cross.

SAME—CROSSING ACCIDENT—LAST CLEAR CHANCE. The doctrine of last clear chance has no application, where, if there was contributory negligence, it continued up to the instant of the collision; nor where there was no contributory negligence, as the rule presupposes the existence of contributory negligence.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered March 27, 1916, upon granting a nonsuit, dismissing an action for damages to an automobile through a collision with an electric train. Reversed.

*Roche & Onstine*, for appellant.

*Graves, Kizer & Graves*, for respondent.

[1]Reported in 166 Pac. 797.

ELLIS, C. J.—In this action plaintiff sought to recover damages for the destruction of his automobile through a collision with one of defendant's trains at the crossing at Willow Springs station on defendant's electric railway line.

Plaintiff's evidence shows that, at the point in question, the railway track runs from north to south, approaching the crossing at a down grade of a little over two per cent. The public highway runs from east to west, approaching the crossing at a down grade of about two and one-half per cent. The highway right of way is about forty feet wide, with the narrower traveled roadway along the middle. Immediately north of the highway right of way, the ground rises in a considerable hill or plateau, necessitating a deep cut for the railway line for some distance to the north, from which cut the railway tracks emerge approximately at the northerly boundary of the highway right of way. A switching track lies a few feet west of the main track and joins it about 175 feet north of the crossing. The space between the rails and between the two tracks immediately at the crossing is planked for a distance north and south of about 16 feet. At the time of the accident, a freight car was standing on the switch just south of the crossing, the north end extending two and one-half feet over this planked roadway. At that time, September 4, 1915, there was a thick growth of Chinese lettuce and other vegetation, four or five feet high, on top of the banks of the cut. The trial was in March, 1916, at which time this growth had disappeared. From measurements taken a few days before the trial, it appears that a man standing in the middle of the roadway at a point twenty feet east of the east rail of the main railway track could see another man for a distance of 175 feet north on the railroad; standing at a point fifteen feet east from the same rail, he could see the other man for a distance of 250 feet north; standing ten feet from the rail, he could see the other man for 400 feet north; standing eight feet from the rail, he could see the other man for only 260 feet, because of the coincidence of a line of telegraph and

trolley wire poles with the line of vision; standing six feet from the rail, he could see up the track 660 feet. So far as the evidence shows, the only other or earlier possibility of a visual warning of the approach of a train would have been to look for the pantographs or trolley supports on top of the motor car, which it is admitted would have been visible above the bank of the cut to a traveler on the highway back for some 200 feet before his passing from behind the bank so as to have any view up the cut. How far up the track from the crossing the pantographs would have been so visible does not appear. From photographs in evidence it appears, however, that they were not so massive as to be readily discernible at any considerable distance.

Plaintiff, a farmer, resided a short distance east of the railway track and south of the highway. He left his home in his automobile at about 2:30 in the afternoon. He saw the regular train pass about ten minutes previously. He entered upon the highway a few hundred feet east of the railroad crossing and proceeded toward the crossing at a speed of about seven to ten miles an hour till the front of his car was within about fifteen feet of the east rail of the main track. He himself was about twenty feet from the track. He then reduced speed to one mile an hour or less. He said, "I was just creeping along." He testified that from there on, proceeding at this slow pace, he was looking for trains practically all the time, only turning his eyes ahead to see where he was going and avoid the car on the crossing. He neither saw nor heard any train till the front of his automobile was about six inches from the east rail of the main track, when he first saw the train, a special, coming rapidly through the cut from the north at a distance of between 100 and 175 feet. He said, "It was too late for me, at the time, to stop and reverse, in case I had trouble to shift my engine, so I proceeded on; I thought I had time to clear the track." And again, "I gave her all the juice I had and I took it in a jump." The train struck the rear end of the automobile, throwing it

against the car on the switch, wrecking the automobile and slightly injuring plaintiff. The train consisted of two cars pulled by a motor car pushing another motor car in front of it. Plaintiff and two other witnesses testified that the train was running fifty or sixty miles an hour at the time, and came to a stop about 800 or 1,000 feet south of the crossing. Plaintiff testified that he heard no whistle or bell and that the motorman told him he had no bell, that the whistle was out of order, and that he could not see ahead because the front motor obstructed his view. One witness, who at the time was a short distance east of the crossing, said he heard a very faint whistle about two seconds before the crash. Another witness said that the motorman claimed to have given all the warning necessary. So far as the evidence shows, there was no lookout in the front motor car.

At the close of plaintiff's evidence, the trial court granted a nonsuit on defendant's motion on the ground of contributory negligence, and dismissed the action. Plaintiff appealed.

Appellant contends (1) that the accident was caused solely by respondent's negligence; (2) that appellant was not guilty of contributory negligence, and (3) that, in any event, the cause should have been submitted to the jury under the rule of last clear chance.

The evidence clearly shows that respondent was guilty of negligence. To run a train through this deep cut debouching immediately upon a much used public crossing, where any adequate view of the track from the roadway was much obstructed, at anything like fifty miles an hour, with no warning save the faint sound of a whistle just an instant before reaching the crossing, was palpable negligence.

It is almost equally clear that appellant was not guilty of contributory negligence as a matter of law. It is argued that he could have looked over the elevation from the higher part of the highway and so observe the approach of the motor pantographs above the vegetation. But warning from

that source, of course, presupposes the presence of the train in the cut at the time of observation. If the train was running at the rate of fifty or sixty miles an hour, which is the only evidence we have on the subject, it was not anywhere near the south end of the cut until plaintiff was down near the crossing moving at a snail's pace and endeavoring to look up the track itself, as he was bound in law to do. Even there, taking as true, as we must, the measurements in evidence, his view up the track was so intermittently obstructed as to make it but a chance that he would see a train moving at that speed before he was himself within six or eight feet of the crossing, when the front of his machine would be practically upon the track. In the situation detailed in evidence, we cannot agree with the trial court that, if he had looked, he must of necessity have seen the train in time to stop completely before reaching the zone of danger. The train was running down grade, making but little noise, and gave no adequate or timely signal of its approach. The evidence of the high speed of the train and of the short distance appellant could see up the track at any time before reaching it makes it extremely questionable whether the train had reached any point in the range of his vision when he was twenty, fifteen, or even ten feet from the track. Herein lies the vital distinction between this case and that of *McKinney v. Port Townsend & P. S. R. Co.*, 91 Wash. 387, 158 Pac. 107, mainly relied upon by respondent. In that case, the evidence was conclusive that the driver of the automobile had a plain view of the train when he was eighteen or twenty feet from the track and recklessly attempted to cross in front of it. Here appellant did not see the train, and probably could not have seen it, until an attempt to reverse and back the automobile would have been more hazardous than the attempt to cross. Under the evidence now before us, the question whether appellant was guilty of contributory negligence was one for the jury. *Stewart v. Northern Pac. R. Co.*, 96 Wash. 486, 165 Pac. 377.

The rule of last clear chance is not involved. If appellant

was guilty of contributory negligence, that negligence continued to the instant of collision. In such a case, respondent would be liable only in case the motorman actually saw the automobile in time to avoid the collision. There is no evidence whatever that he saw it at all. There was, therefore, nothing to relieve appellant's negligence of its contributory character. *O'Brien v. Washington Water Power Co.*, 79 Wash. 82, 139 Pac. 771. If, on the other hand, appellant was not guilty of contributory negligence, the collision was referable solely to respondent's negligence, and the rule of last clear chance, which presupposes the existence of contributory negligence, is not applicable. For a full discussion of the governing principles see *Mosso v. Stanton Co.*, 75 Wash. 220, 134 Pac. 941, and note to that case in L. R. A. 1916A 943. See, also, *McKinney v. Port Townsend & P. S. R. Co.*, *supra*, and *Nicol v. Oregon-Washington R. & Nav. Co.*, 71 Wash. 409, 128 Pac. 628, 43 L. R. A. (N. S.) 174.

The sole debatable question of fact presented by the evidence now before us is the question of contributory negligence. That, as we have seen, was a question for the jury under proper instructions.

The judgment is reversed, and the cause is remanded for a new trial.

MOUNT, PARKER, FULLERTON, and HOLCOMB, JJ., concur.